1
2
3
4
5
6                    UNITED STATES DISTRICT COURT
7                   NORTHERN DISTRICT OF CALIFORNIA
8
9    JERRY BROWN,                          Case No.  17-cv-02691-PJH
10               Petitioner,
                                           **ORDER DENYING PETITION FOR
11        v.                               WRIT OF HABEAS CORPUS AND
                                           GRANTING CERTIFICATE OF
12   RAYMOND MADDEN,                       APPEALABILITY**
13               Respondent.
14
15        This is a habeas corpus case filed pro se by a state prisoner pursuant to 28 U.S.C.

16   § 2254.  The court ordered respondent to show cause why the writ should not be granted.

17   Respondent filed an answer and lodged exhibits with the court and petitioner filed a

18   traverse.  For the reasons set out below, the petition is denied.

19                              **BACKGROUND**

20        A jury found petitioner guilty of sexual and related offenses involving four women.

21   *People v. Brown*, No. A139357, 2015 WL 7572482, at *1 (Cal. Ct. App. Nov. 25, 2015).

22   Petitioner was sentenced to a determinate term of 37 years and eight months in prison

23   and a consecutive term of life with the possibility of parole, with the requirement that he

24   serve at least seven years.  *Id.*  The California Court of Appeal affirmed the conviction

25   and the California Supreme Court denied review.  *Id.*; Answer, Exs. 7, 8.

26
27
28

United States District Court
Northern District of California

United States District Court
Northern District of California

# STATEMENT OF FACTS

The California Court of Appeal set forth the relevant facts:

> 1. The Prosecution's Case
> a. Aisha Doe
> On June 11, 2008, at approximately 9:00 p.m., Aisha Doe left the Berkeley Adult School campus.  She was 18 years old at the time.  After she used an ATM at the corner of San Pablo and University Avenues, a gray pickup truck pulled up next to her.  Aisha later identified Brown as the driver of the truck.  Brown asked Aisha if she needed a ride.  Aisha initially ignored him, but Brown asked her a second time.  He also asked about her age and told her it was not safe for her to be out so late at night.  She got into Brown's truck and said she was headed home to Richmond.

> When Aisha got into the truck, Brown was headed toward Richmond, but he turned the truck around and drove in the opposite direction.  Aisha told Brown he was going the wrong way, and he responded he was taking a different route.  When he continued driving in the wrong direction, Aisha began to panic and asked Brown where he was taking her.  Brown told her he was a police officer.  Aisha no longer wanted to be in the truck with him.  Brown stopped the truck on a dead-end street.  He showed her the barrel or handle of a gun, plastic cuffs, and something that looked like a badge.  He told her he was arresting her for prostitution, and he asked to see her identification and the contents of her purse.  She had $260 in the purse.  Brown dumped the contents of the purse on the seat between them, and told her to give him the ring she was wearing.  She complied.  Brown told Aisha that if she did not cooperate with him, he would put the cuffs on her and take her to jail.

> Brown drove the two away from that location.  He entered the freeway toward Oakland and told Aisha he was taking her to jail.  He asked her what she would do for him in exchange for being released.  When Brown drove by the police station in downtown Oakland, Aisha asked him to stop and take her to jail, but he kept driving .  Brown exited the freeway at Embarcadero in Oakland.  He said he was going to find a hotel.  Aisha thought Brown might rape or kill her.

> Aisha saw two men standing next to a disabled car.  She started banging on the window and yelling to get their attention.  She got out of the truck while it was still moving and ran toward the men.  Brown braked his vehicle and backed up toward Aisha's location.  He then drove away. Aisha used a borrowed cell phone to call 911.  Brown drove by Aisha and the men a few minutes later, and they were able to obtain the truck's license plate number.

**b. Cynthia Doe**

On March 16, 2009, at about 9:30 a.m., 20–year–old Cynthia Doe was at a bus stop at 45th Avenue and International Boulevard in Oakland.  A silver four-door car pulled up. The driver, whom Cynthia later identified as Brown, rolled down his window and asked her if she remembered him.  Cynthia was considering acting as a prostitute because she needed the money, and she thought Brown wanted a "date."   After Cynthia told Brown she did not remember him, he said he was a police officer and told her she was under arrest.  Cynthia saw handcuffs and a radio in the car.  She was frightened. Brown told Cynthia to get into the car, and she complied.

Brown drove by an Oakland police station, pointed it out, and told Cynthia she was going to jail.  He parked near the station and honked his horn.  He explained he was signaling to his partner, who was in another car, that "everything was okay." Brown ordered Cynthia out of the car and patted her down. He then ordered her to get into the back seat of the car. Brown took a small walkie-talkie out of the glove compartment, spoke briefly into it, and showed Cynthia a badge.  Brown began driving again.  Cynthia asked Brown to arrest her and take her to jail.

As he was driving, Brown told Cynthia that he liked anal sex but his wife did not.  Brown stopped at a second building and moved Cynthia to the front seat.

He then drove to a parking garage in Emeryville.  He first stopped on the top level of the garage, where he used his cell phone to make a call and spoke into the walkie-talkie again. He then drove to a lower level in the parking garage.  He unzipped his pants and exposed his erect penis.  He pulled Cynthia's face toward him.  She would not look at him.  He grabbed her hair and pulled her toward his penis.  His penis touched her lips and cheek.  Cynthia told Brown she was going to bite him.  Brown released her hair and walked around to her side of the car.

Brown opened the car door and pulled Cynthia out of the car. He turned her around and pushed her back into the car.  He pulled her underwear to the side and used his hands to pull apart her buttocks.  Cynthia asked Brown three times to use a condom.  He did not respond the first two times but, after the third, said he would use a condom.   Cynthia was scared. Brown inserted his finger into her anus twice, and then penetrated her anus with his penis.   The penetration was painful, and Cynthia was crying.  After a few minutes, Brown ejaculated.  Cynthia felt liquid running down her leg.  Brown walked around the car. He returned with a napkin and wiped Cynthia's "butt" and legs.  Brown fixed Cynthia's clothing and got back into the car.

Brown drove Cynthia back toward Oakland.  During the drive, he told her that if he saw her again, he would not take her to jail.   He identified himself as Sergeant Crenshaw of the

3

Oakland Police Department.  He asked Cynthia for her name and birth date.  Brown dropped Cynthia off about a block away from where he had picked her up.  Cynthia walked to a Walgreens store and asked employees to call 911.  She told an employee she had been raped and that the rapist was in a silver car.  She also told the employee the rapist had identified himself as a police officer.  Cynthia provided additional information to the 911 operator.  The Walgreens employee testified that Cynthia was shocked and scared when she entered the store.

Cynthia went to Highland Hospital, where a sexual-assault examination was performed.  She told the examiner that her assailant had penetrated her anus, twice with his finger and three times with his penis.  Cynthia experienced extreme pain and multiple external abrasions; the examiner testified that Cynthia's injuries were consistent with her account of what had occurred.

c.  A. Doe

In March 2009, 20–year–old A. Doe was working as a prostitute near the corner of San Pablo Avenue and 35th Street in Oakland.  One night at about 10:00 or 11:00, a pickup truck stopped near her.  The driver, whom A. later identified as Brown, stepped out of the truck and stated he was a police officer.  Brown showed A. a badge, put her into the truck, and handcuffed her to the door handle.  A. had had a bad feeling about the situation, and she had not wanted to get into the truck.  Brown got into the truck with her.  His penis was exposed.

Brown drove down San Pablo Avenue and parked behind a school near Lake Merritt.  He used a walkie-talkie to ask for backup.  A. asked Brown if he was going to take her to jail.  Brown asked her if she wanted to live, and A. was scared and did not respond.  She did not want to be in Brown's truck.  She thought Brown had a gun because he kept holding his side.

After about 30 minutes, Brown drove his truck to a location near North County jail.  He told A. that if she wanted to live she was going to "suck his dick without a condom."  Brown uncuffed A.  Brown said he needed to urinate, and he got out of the truck and started walking toward the passenger side of the truck.  A. then got out the driver's s ide door and started to run.  She went to her sister's residence. She did not call the police at that time because she did not think they would believe her.

A few weeks later, A. saw Brown's truck and called the police with the license plate number.  She then gave the police a statement about the incident.   A. identified Brown from a photographic lineup.

d.  Georgia Doe

At about 9:00 p.m. on April 4, 2009, a pickup truck approached 27–year–old Georgia Doe, who was walking near the corner of San Pablo Avenue and Carrison Street in Berkeley.  Georgia later identified Brown as the driver.  Brown offered $100 for a "half and half," which is oral and vaginal sex.  Georgia asked Brown if he was law enforcement; he said he was not.  Georgia then got into the truck.  Brown drove to a spot on Heinz Street and flashed his headlights before stopping.  He then said he was an undercover Berkeley police officer.  Brown showed Georgia a badge and a walkie-talkie, and he said he had a service revolver under the seat.  Georgia was frightened and wanted to cooperate to avoid going to jail.

Brown allowed Georgia to step out of the truck and smoke a cigarette, but warned her not to do anything stupid.  Brown then asked her if she was ready.  Brown told Georgia to give him oral sex.  She pulled out a condom, but he snatched it and told her that a condom was unacceptable.  She orally copulated him for about 15 minutes, but did not do so willingly.  Brown then got out of the truck and walked to Georgia's side of the truck.  She was standing in the passenger's side doorway.  Brown urinated.  He put on a condom and proceeded to have anal sex with Georgia for 45 minutes to one hour.  The anal sex tore her, and she was crying.  Brown stopped when he ejaculated.  He told Georgia to pull up her pants and get into the truck.  Brown then drove her to San Pablo Avenue and dropped her off.

Georgia went back to the car in which she was living.  She later went to the corner of University Avenue and flagged down a police officer.  She returned to the scene of the incident with the police and gave a statement to the police.  The police took Georgia to Highland Hospital, where she was examined by a physician's assistant.  The examiner testified that Georgia had multiple tears to her anus.  The injuries were significant and consistent with Georgia's statement she had been anally raped.  She was in pain for at least five days.

2. The Defense Case

Brown testified that he is married to Tricia Foster Brown.  In 2009, he drove a truck that was registered to her.  He testified that he used a walkie-talkie for work and kept it in the truck, but he did not use it to impersonate police officers.  He maintained that he did not have a gun, badge, or handcuffs.

In additional testimony, Brown said that he supplemented his income with drug sales.  Beginning in 1996, he used some of his profits to pay for acts of prostitution at strip clubs, and beginning around 2006, he started picking up prostitutes on the street.  Between 2006 and 2009, Brown solicited acts of prostitution more than 100 times.  He also testified that, when he paid prostitutes for sex, he frequently paid one-half of the agreed-upon amount before the sexual acts, and paid the remainder afterwards.

United States District Court
Northern District of California

Brown admitted interacting with Aisha Doe, Cynthia Doe, and Georgia Doe, but he denied interacting with A. Doe.   In testifying about his interaction with Aisha Doe, he stated that he saw her walking on San Pablo Avenue sometime in 2008. He offered her a ride.  Aisha said she was working and asked if Brown was looking.  Brown said yes, and Aisha got into his truck.  According to Brown, they negotiated a price for sex acts, but he never told her he was a police officer and did not threaten her.  Aisha told him she had a room and gave him directions.  But he claimed that she asked for his identification to rent a room, and he refused to give it to her.   Brown testified that he then told her he did not want to use her services and she became angry and tried to grab his truck keys.  Brown told her to get out of the truck.  She got out of the truck and started running and waving her arms.  He left, came back, saw her with two men, and drove away.

In testifying about his interaction with Cynthia Doe, Brown stated that he saw her on International Boulevard in March 2009.  He asked her if she was "dating," and she said she was.  He testified that he asked her if she would engage in anal sex, and she agreed to do so for $100.  According to Brown, she voluntarily got into his truck.  Cynthia told Brown to get on the freeway, and he followed her directions.  He drove to the parking structure in Emeryville, where they had anal sex.  Cynthia told him to hurry.  Brown testified that he only paid her half of the money because she did not perform oral sex and that he later dropped her off.

Brown testified that he saw Georgia Doe a few weeks later near Ashby and San Pablo.  He asked her if she was "dating," she said she was, and she then got into his truck.  Brown agreed to pay her $100.  Georgia directed him to drive, and they stopped on Heinz Street.  Brown testified that he told her that he would pay half the money up front and the other half after the sexual act.  Georgia grudgingly agreed.   According to Brown, she refused to orally copulate him because she said he smelled like he had been having sex, but she agreed to have anal sex. He started to perform anal sex, but she rushed him.  They stopped and got back into the truck a few times when a security guard in a truck drove by.  Brown never finished the sex act, and he refused to pay Georgia the rest of the money.  Brown testified that Georgia became upset and stated that he "fucked with the wrong one" and would "get" his.  Brown stated that he did not threaten Georgia or identify himself as a police officer.

. . .

The jury found Brown guilty of the sodomy and oral copulation charges as to Georgia Doe and Cynthia Doe (counts 1, 2, 7, and 8) and kidnapping to commit sodomy as to Aisha Doe (count 5).  As to the kidnapping charges in counts 3 and 6, the jury found Brown guilty of the lesser included offenses of false imprisonment (count 3, Georgia Doe) and simple kidnapping

(count 6, A. Doe). The jury acquitted Brown of robbing Aisha Doe (count 4), and it found not true the personal firearm use allegation in count 5. The court dismissed the prior conviction allegations. The court sentenced Brown to a determinate term of 37 years, eight months in prison for counts 1, 2, 3, 6, 7, and 8, and a consecutive indeterminate term of life imprisonment with the possibility of parole on count 5.

*Brown*, 2015 WL 7572482, at *1-5.

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *see Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *see Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

United States District Court
Northern District of California

United States District Court
Northern District of California

1

2

3

4

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding."  *See Miller-El*, 537 U.S. at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

5

6

7

8

9

10

11

The state court decision to which § 2254(d) applies is the "last reasoned decision" of the state court.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005).  When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion.  *See Nunnemaker* at 801-06; *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000).  The court looks to the California Court of Appeal opinion for all claims in this petition.

12

### DISCUSSION

13

14

15

As grounds for federal habeas relief, petitioner asserts that: (1) the trial court committed misconduct in questioning several witnesses; (2) there was an improper jury instruction; and (3) his sentence violates the Eighth Amendment.[1]

16

### I.        JUDICIAL MISCONDUCT

17

18

19

20

Petitioner first argues that the trial court committed misconduct by questioning him and his wife at trial.  He contends that the questioning undermined his credibility, conveyed to the jury that the trial court considered him dishonest, and violated his due process rights and a fair trial.

21

### BACKGROUND

22

23

24

25

26

During the trial, the trial court questioned several witnesses.  *Brown*, 2015 WL 7572482, at *5.  The trial court asked petitioner about his transactions with prostitutes, aliases he used and his practice of paying only a portion of the price prior to the sexual act.  *Id.*  The trial court asked petitioner's wife, Tricia Foster Brown, if his activities with prostitutes affected her opinion of his honesty.  *Id.*

27

28

---

[1] Several other claims were previously dismissed as procedurally defaulted and are no longer part of the petition.  Docket No. 34.

8

The California Court of Appeal set forth the relevant background:

a.  The Court's Questioning of Brown
After the prosecutor completed her re-cross-examination of Brown and both counsel stated they had no further questions, the court questioned Brown as follows:

"[Court]: I have some questions for you, sir. [¶] When you were arrested for soliciting an act of prostitution in Vallejo in 2011, when the officer asked for identification, where was your I.D. located?

"[Brown]: I want to say the trunk.

"[Court]: Okay. The trunk.

"[Brown]: The backseat. I'm sorry. It was the backseat.

"[Court]: Okay. The backseat. Okay. [¶] During the time you were dealing drugs, what name did you use?

"[Brown]: My name.

"[Court]: And that would be Jerry Brown?

"[Brown]: Yes.

"[Court]: Okay. And when you solicited prostitutes, did you use any names?

"[Brown]: I would use, um, a lot of different names.

"[Court]: Which are?

"[Brown]: I can't recall.

"[Court]: Well, think of, if you can, any one name you would use when you solicited a prostitute.

"[Brown]: Mike. Sometimes I would use my own. If I was comfortable with the person, I would use my own name.

"[Court]: Jerry?

"[Brown]: Yes.

"[Court]: As you sit there now in these—I don't know—ten years or more of soliciting acts of prostitution, the only two names that you can remember now that you ever used that was not yours was Mike?

"[Brown]: Well, I mean—I can't—I just—

"[Court]: I am asking the question. [¶] As you sit there now, in all of the years that you have testified you solicited acts of

United States District Court
Northern District of California

prostitution, is the only name you could ever remember you told someone, the prostitutes, Mike?

"[Brown]: Dave.

"[Court]: Dave. Any other name you remember telling them?

"[Brown]: John.

"[Court]: John. [¶] Any other name you remember telling them?

"[Brown]: No. That's about it.

"[Court]: Okay. So Mike, Dave, and John, and sometimes your own."

After the prosecutor asked one follow-up question on this point and both counsel again stated they had no further questions, the court questioned Brown again:

"[Court]: Okay. I just have one [question]. [¶] When you testified yesterday, and this is during the portion when we were talking about Cynthia Doe—

"[Brown]: Um-hum.

"[Court]: —and you said that you rode over to the IKEA lot— this is just foundational—and she was talking about her husband and her kids. And you arrived at the IKEA lot, and you told her at that time that you would give her $40 now and $40 after the sexual act. She hesitated. By your testimony, she wanted to hold your bank card, but you said 'no.' And she agreed. So—[¶] Correct? Is that all correct? Do you remember that testimony yesterday?

"[Brown]: Well, because she—she—

"[Court]: I am just asking if [you] remember that testimony.

"[Brown]: Yes.

"[Court]: Okay. And then you said in—over 50 times you have sort of arranged with a prostitute an amount, and then when you arrived to perform that amount—to perform the sex act, you then told them that you would give them one half now and one half later; is that correct?

"[Brown]: Yes, ma'am.

"[Court]: And since you've testified, you have had approximately 150, I think it was—over 150 prostitution encounters, correct?

"[Brown]: Yes, ma'am.

10

"[Court]: And in these encounters that you've had, has it been your—is it your experience that prostitutes will perform this sexual act without getting their money?

"[Brown]: Yes, ma'am."

b. The Court's Questioning of Tricia Foster Brown

On direct examination, Brown's wife testified that she trusts Brown, and he has a reputation for honesty.  She stated, "People trust him.  This is my opinion.  People trust him.  I trust him.  Everyone that I know trusts him and knows him to be honest."   During cross-examination, the prosecutor followed up by asking Ms. Brown about Brown's convictions for selling drugs, for domestic violence against his former wife, and his sexual liaisons with prostitutes.  The prosecutor asked Ms. Brown if her opinion that Brown was honest and truthful would change if Ms. Brown knew that Brown "admitted to us yesterday that he had had anal sex with prostitutes over 150 times."  Ms. Brown testified that, although she would be upset if Brown told her that, it would not change her opinion of him because she loves him and will honor him and cannot judge him.

The prosecutor asked Ms. Brown whether she had known before the trial that her husband had "admitted to having anal sex more than 150 times," "has had sex with hundreds of prostitutes since 1996," "has admitted to having sexual acts with prostitutes in both cars and hotels," "has admitted to spending thousands of dollars on prostitutes [since 2006]," and "has admitted that he would engage in sex acts with prostitutes whenever he had time."  Ms. Brown stated she had not been aware of these things.   In response to the prosecutor's questions, Ms. Brown testified that she was not aware that Brown had testified that he repeatedly anally penetrated one of the victims in this case in Ms. Brown's car, that he anally penetrated two different victims in the case, and that he anally penetrated one victim more than ten times.  In response to further questioning by the prosecutor, Ms. Brown stated she was not aware that Brown had testified that he was looking to pick up a prostitute almost every day between March and April 2009, when Ms. Brown was eight to nine months pregnant.   The prosecutor concluded her cross-examination by asking: "After hearing all the things that your husband has admitted to us about his prostitution habits, does that change your opinion as to whether he is an honest, trustworthy person?" Ms. Brown responded: "Not at all."

After redirect and re-cross-examination, the court questioned Ms. Brown:

"[Court]: I have a question to clarify. [¶] Now, you stated your husband is honest.

"[Ms. Brown]: Yes.

"[Court]: The District Attorney went through a series of

11

statements to you about what she says your husband stated under oath here in court yesterday, and it was to you from the D.A. The defendant said that he used your car to solicit prostitutes, he admitted that he repeatedly anally penetrated one of the victims in your vehicle. [¶] I have a question, Counsel. I am just laying my foundation.

"[Defense Counsel]: Well, it's a question on the evidence, your Honor.

"[Court]: No, it's not. I am going to ask her a question, Counsel. It is foundation as to what was just stated by the D.A. to her. I just want her to understand my foundational question before I ask my question. [¶] It was also indicated that he admitted that he picked up two victims and anally penetrated them, and he anally penetrated, by his admission, per the D.A, one victim more than 10 times, and between March of '09 and April of '09 he was looking for prostitutes daily during the time you were pregnant.

"[Court]: Do you remember all of that?

"[Ms. Brown]: Do I remember her asking?

"[Court]: Yes.

"[Ms. Brown]: Yes.

"[Court]: And this is not information you said you knew about, correct?

"[Ms. Brown]: Correct.

"[Court]: May I ask, um, how does your view of honesty—this presentation to you of information that was indicated your husband admitted under oath on the stand, how does that, in your view, relate to your own view of—well, strike that. [¶] In your view, given the information, is this—is what you viewed with your husband an honest presentation?

"[Ms. Brown]: Can I ask you what I think you are asking me?

"[Court]: Well, no. If you are unclear, I am going to ask.

"[Ms. Brown]: Okay.

"[Court]: You have heard all the information, and my question is[ ], is this an honest presentation that those things were actually occurring to you, what you saw your husband engaging in daily with you, would that have been an honest presentation.

"[Ms. Brown]: That instance—well, this instance or the prostitute incident, no, it's not something that I would consider being honest because I didn't know.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

"[Court]: Okay.

"[Ms. Brown]: But in other aspects of our marriage and our life together and me knowing him, and much more than just that, then, yes, I do, and I trust him with my life and my kids.

"[Court]: Okay. So thank you. [¶] So the presentation about the prostitutes in your view, would not have been an honest presentation, correct?

"[Ms. Brown]: When you say 'presentation'—

"[Court]: Well, I mean, what was stated about engaging—your husband engaging in the acts of prostitution, that, in your view, would not be honest?

"[Ms. Brown]: To act in that way?

"[Court]: Yes.

"[Ms. Brown]: I don't think honest—

"[Court]: For you as his wife.

"[Ms. Brown]: Towards me, okay.

"[Court]: I am asking about your view and how you view honesty.

"[Ms. Brown]: I don't think that's honest with—no. If you didn't tell me something, then it's not being honest. If you withheld information, you didn't lie about it, you just didn't tell me, you withheld it from me, then no, I don't think that in that instance is being honest.

"[Court]: And if that's not being honest, and how is your opinion that he is honest, how is that impacted, if at all?

"[Ms. Brown]: It's not.

"[Court]: Because?

"[Ms. Brown]: Because he's done so much. He raises our children. I can't raise a man. He has raised our children. He's been there all the time. My kids have grown up in the gym. My baby still knows his dad. He hasn't seen him, but he knows his dad. If he sees a picture, he says, That's my daddy.

"[Court]: Okay.

"[Ms. Brown]: And—

"[Court]: I don't want to put words in your mouth. In your view, on balance, even though there may be some things that are not honest, you feel overall he is honest.

"[Ms. Brown]: His other attributes of him as a person as a human outweigh mistakes that he has made.

"[Court]: Okay. All right. Thank you."

After this questioning, the prosecutor asked Ms. Brown: "Does a married man who visits hundreds of prostitutes, does that speak to his honesty or his dishonesty?" Ms. Brown said that, as a woman, she could not "honestly give you an opinion on what a man might be." During this line of questioning, the court restated the prosecutor's question to clarify that it sought from Ms. Brown (who already had opined about Brown's honesty) a more general opinion about married men who visit prostitutes. The following exchange occurred:

"[Prosecutor]: I am not asking for a man's opinion. I am asking for your opinion.

"[Ms. Brown]: You are asking my opinion on a man.

"[Prosecutor]: I am asking your opinion.

"[Court]: It is your opinion—because you have rendered an opinion already about honesty in this case with the defendant, and the question is just more generally: Do you view a married man who visits prostitutes, is that honest, in your view?

"[Ms. Brown]: I don't think that visiting a prostitute is—I don't think the word would be him being honest. The action or maybe not telling his wife would be dishonest, so—"

Finally, the prosecutor asked Ms. Brown whether it would be disloyal for a married man to visit a prostitute, and Ms. Brown agreed it would be. The prosecutor then asked whether Brown had been disloyal, and the court overruled defense counsel's objections to that question.

"[Prosecutor]: The activity we have talked about with your husband and his activities with prostitutes, that shows disloyalment [sic], right?

"[Defense Counsel]: That's argumentative. [¶] The D.A. has asked, the Court has asked. The point is made. You can't beat a dead horse.

"[Court]: Well, yeah. You don't beat dead horses usually, but she certainly gets to go into the area that, in fact, is raised by the question. [¶] So go on.

"[Defense Counsel]: The question should have been raised. The examination was completed.

"[Prosecutor]: Can I continue?

"[Court]: Yes.

"[Prosecutor]: Thank you. . . . Visiting prostitutes, your husband visiting prostitutes, that is disloyal to you?

"[Ms. Brown]: Yes."

c. The Parties' Discussion of the Court's Questioning
After Ms. Brown was excused and another witness testified, the court spoke with counsel outside the presence of the jury and referred to defense counsel's statements near the end of Ms. Brown's testimony.

"[Court]: Counsel, may I just say this?  And I know you did not mean to be disrespectful, and I am not going to say anything to the jury, because I have already indicated to them that from time to time the Court will ask questions to bring out matters that it seeks to clarify.  Your statement after the Court had questioned and you began questioning and you indicated, Well, the testimony was already concluded and no question should have been asked at all, that's not really an accurate statement that no questions should have been asked. [¶] The Court has again the ability to ask the questions that it believes, in fact, should be clarified.  And I actually had an issue that I thought should be addressed regarding her view of honesty. [¶] And with all due respect to everybody, particularly the defendant in this case, she really made a better presentation after the Court's inquiry because she essentially said, in my view, that what I viewed in terms of what he did, is sort of in balance with who I know him to be. You still think he is an honest person, I still think he is trustworthy.  But I just want to say, to suggest that the Court should not ask anything, that is simply just not the case.

"[Defense Counsel]: I didn't suggest that, with all due respect.

"[Court]: That's how I understood it.

"[Defense Counsel]: I said the examination was concluded.

"[Court]: You said it shouldn't have been asked anyway. [¶] I am not upset with anybody. I am just saying, for the jury I do ask questions from time to time. My—

"[Defense Counsel]: I do want to say for the record at the end of my client's testimony you asked a question that was indicating, in my view, to the jury that you didn't believe him that a prostitute would accept money without performing the sex act.  And then you asked a question of his wife how it could be indicated that you didn't believe the guy could be honest who was visiting prostitutes?  That's how it came up.

"[Court]: No.  I'm sorry that you took it that way.  That's not how the Court asked it nor why I asked it.  I don't have a view. I am trying to clarify what I have heard in the evidence that I believe should be clarified as the jury does their duty.  I am not the trier of fact here, but I don't want to suggested [sic]

1

that the Court cannot ask a question and it is improper for the
Court to do so because that's not the [case]."

2

3

*Brown*, 2015 WL 7572482, at *5-9.

**LEGAL STANDARD**

4

5

A trial judge has broad authority to explain and comment on the evidence at trial.

6

*Quercia v. United States*, 289 U.S. 466, 469-70 (1933).  It is generally appropriate for a

7

trial judge to participate in the examination of witnesses for the purpose of clarifying the

8

evidence, confining counsel to evidentiary rulings, controlling the orderly presentation of

9

the evidence, and preventing undue repetition of testimony.  *United States v. Morgan*,

10

376 F.3d 1002, 1008 (9th Cir. 2004).  This authority, however, is not boundless.  *Quercia*,

11

289 U.S. at 470-72.  For example, when a trial judge draws the jury's attention to the

12

parts of the evidence he or she thinks are important or expresses an opinion as to a

13

witness's credibility, the judge must make it "clear to the jury that all matters of fact are

14

submitted to [its] determination."  *Id.* at 469.  A trial judge's participation oversteps the

15

bounds of propriety and deprives the parties of a fair trial only when the record discloses

16

actual bias or leaves the reviewing court with an abiding impression that the judge's

17

remarks and questioning projected to the jury an appearance of advocacy or partiality.

18

*See United States v. Parker*, 241 F.3d 1114, 1119 (9th Cir. 2001); *see, e.g.*, *United*

19

*States v. Odachyan*, 749 F.3d 798, 802-03 (9th Cir. 2014) (statement by district court at

20

sentencing did not reflect such a high degree of favoritism or antagonism as to make fair

21

judgment impossible and therefore does not evidence constitutional error, where it

22

appears that statement was in response to arguments made by defendant, was offered to

23

explain why court was not persuaded by arguments and at most reflects a general

24

frustration with the type of argument defendant made at sentencing); *Morgan*, 376 F.3d at

25

1008-09 (federal district judge's extensive and suggestive examination of witness did not

26

require reversal where other testimony, as well as court's curative instructions, made it

27

highly unlikely that "a substantial right of a defendant was affected").

28

United States District Court
Northern District of California

A claim of judicial misconduct by a state judge in the context of federal habeas review does not simply require that the federal court determine whether the state judge committed judicial misconduct; rather, the question is whether the state judge's behavior "rendered the trial so fundamentally unfair as to violate federal due process under the United States Constitution." *Duckett v. Godinez*, 67 F.3d 734, 740 (9th Cir. 1995). It is not enough that a federal court not approve of a state judge's conduct. Objectionable as the conduct at issue might be, when considered in the context of the trial as a whole it may not be of sufficient gravity to warrant the conclusion that fundamental fairness was denied. *See id.* at 741 (citations omitted).

**ANALYSIS**

The California Court of Appeal denied this claim and noted that the claim was not properly preserved for appeal:

> First, we reject the argument because it was not properly preserved. Although defense counsel objected to some of the prosecutor's questions, defense counsel did not object to any of the trial court's questions of Brown or his wife during their testimony. The failure to object below generally forfeits an appellate claim that a judge's examination of a witness constituted misconduct. (*People v. Harris* (2005) 37 Cal. 4th 310, 350.) But the claim is not forfeited if it can be established that the objection below would have been futile. (*People v. Houston* (2012) 54 Cal. 4th 1186, 1220.)
>
> Brown argues that it would have been futile for him to have objected below in light of the trial court's statement after the challenged questioning that it believed its examination was proper. We are not persuaded. When defense counsel stated (outside the presence of the jury, and after the conclusion of Brown's and Ms. Brown's testimony) that some of the court's questions suggested a disbelief in aspects of the testimony, the court responded by emphasizing that it had sought to clarify the testimony to assist the jury in performing its factfinding duty, and had not sought to convey any bias or personal view of the testimony. The court also noted that any suggestion by defense counsel that a trial court may not ask any questions of witnesses was incorrect. These comments show that the court correctly understood that it could question witnesses to clarify testimony but could not assume the role of an advocate for either side or usurp the jury's factfinding power. (*See People v. Hawkins* (1995) 10 Cal. 4th 920, 947–948, *overruled on another point in People v. Lasko* (2000) 23 Cal. 4th 101, 109–110.) Nothing in the record suggests that the court would have been unwilling to express this

United States District Court
Northern District of California

understanding in the presence of the jury if defense counsel had objected during Brown's or his wife's testimony.  (*See People v. Corrigan* (1957) 48 Cal. 2d 551, 556 ["We must assume that, had an objection been made, the judge would then have informed the jury that his purpose in so questioning the witness was to establish facts which might affect her credibility, but that it was the exclusive province of the jury to determine the credibility of the witness and the weight to be given her testimony. Such an instruction, given at the time the questions were asked, would have removed any danger that the jury might misunderstand the purpose of the examination."].)  Thus, we conclude that Brown forfeited any claim of judicial misconduct by failing to object on that ground at trial.

But even if we assume that the argument was properly preserved, we reject it on its merits.  "The trial judge has the duty to control all proceedings during the trial with a view to the expeditious and effective ascertainment of the truth regarding the matters involved.  (Pen.Code, § 1044.)  To this end [she] may examine witnesses to elicit or clarify testimony.  [Citations.]  The mere fact that a judge examines a witness at some length does not establish misconduct, nor does the fact that the testimony elicited by the judge's questions would probably have been elicited by counsel."  (*People v. Pierce* (1970) 11 Cal. App. 3d 313, 321; *see People v. Raviart* (2001) 93 Cal. App. 4th 258, 270.)

On the other hand, "[u]nwarranted interruptions of counsel that interfere with a properly conducted examination, excessive questioning that virtually takes the witness out of counsel's hands, or a display of partisanship are improper.  [Citations.]"  (5 Witkin & Epstein, Cal.Criminal Law (4th ed. 2012) Criminal Trial, § 649, p. 1006.)  "The question for us to decide is whether the judge 'officiously and unnecessarily usurp[ed] the duties of the prosecutor . . . and in so doing create[d] the impression that [she] [was] allying [herself] with the prosecution[.]'"  (*People v. Clark* (1992) 3 Cal. 4th 41, 143, *overruled on another point as stated in People v. Pearson* (2013) 56 Cal. 4th 393, 462; *see People v. Cummings* (1993) 4 Cal. 4th 1233, 1305.)

Whether a particular question or series of questions by a judge goes too far is difficult to assess on a cold record, in part because we cannot determine if the tone of any particular question was other than neutral.  (*See People v. Raviart*, *supra*, 93 Cal.App.4th at p. 272 [trial court is "'in a better position than the reviewing court to know when the circumstances warrant or require the interrogation of witnesses from the bench' "].)  As the appellant, Brown has the burden to show error, and we cannot assume the trial court intervened too quickly or inappropriately.

Here, although the trial court asked a fair number of questions, we cannot conclude that it lost its neutrality. Nothing about the content of the questions indicates as much.

The court asked questions of many witnesses, not just Brown and his wife. As the court explained, its questions to Brown and his wife were for the purpose of clarifying the witnesses' testimony. The questions addressed points that the jury might have found relevant to the witnesses' credibility, but the court did not say or suggest that it, rather than the jury, should determine the credibility of the witnesses or the weight to be given to their testimony. (*See People v. Corrigan*, *supra*, 48 Cal. 2d at p. 556.) Its questions did not necessarily favor either side. The court's questions of Ms. Brown, for example, elicited a "better presentation" of her view that Brown's other attributes outweighed his mistakes. We also note that, in the case of both Brown and his wife, the court asked the challenged questions at the least intrusive time, i.e., after counsel had conducted their own examinations of the witnesses (although the court then allowed counsel to ask further questions on the subjects addressed by the court's questions). (*See People v. Robinson* (1960) 179 Cal. App. 2d 624, 639.) This is not a case in which the judge excessively interrupted a questioning attorney or took over an attorney's examination of a witness.

Finally, the trial court instructed the jury with CALCRIM No. 3550, which in part provides: "Do not take anything I said or did during the trial as an indication of what I think about the facts, the witnesses, or what your verdict should be." The court also instructed the jury with CALCRIM No. 101 (which includes virtually identical language) before the trial testimony began. We must presume that the jury followed these instructions and considered the substance of the answers to the trial court's questions (and not the fact that the questions were asked by the trial court) in assessing the evidence. (*See People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

*Brown*, 2015 WL 7572482, at *9-10 (footnote omitted).

A federal court will not review questions of federal law decided by a state court if the decision also rests on a state law ground that is independent of the federal question and adequate to support the judgment. *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991). The Ninth Circuit has recognized and applied the California contemporaneous objection rule in affirming denial of a federal petition on grounds of procedural default where there was a complete failure to object at trial. *See Inthavong v. Lamarque*, 420 F.3d 1055, 1058 (9th Cir. 2005); *Paulino v. Castro*, 371 F.3d 1083, 1092-93 (9th Cir. 2004).

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

In this case the California Court of Appeal found that petitioner did not preserve the argument because trial counsel failed to object to the trial court's questioning of petitioner and his wife.  The California Court of Appeal also rejected petitioner's argument that any objection by trial counsel would have been futile.  Therefore, this claim is procedurally defaulted.  *See Raviart v. McGrath*, 619 F. App'x 620, 621 (9th Cir. 2015) (petitioner's failure to object to the judges questioning provided an adequate and independent ground that precluded federal review.)

Even looking to the merits of the claim, petitioner is not entitled to relief.  The California Court of Appeal's denial of this claim was not an unreasonable application of Supreme Court authority or an unreasonable determination of the facts.

In *Quercia*, the trial judge breached the boundary between the permissible and the impermissible by, among other things, informing the jury that "'wiping' one's hands while testifying was 'almost always an indication of lying'" and by stating that he believed that "'every single word'" the defendant had said was "'a lie,'" except when the defendant had agreed with the government's testimony.  289 U.S. at 468.  The trial judge, according to the Supreme Court, violated the defendant's right to due process because the trial judge did not simply "review the evidence to assist the jury in reaching the truth," but, rather, "in a sweeping denunciation[,] repudiated as a lie all that the accused had said in his own behalf. . . ."  *Id.* at 472.  The facts of this case do not rise to the level described by the Supreme Court in *Quercia*.  Nor has petitioner identified any other Supreme Court authority to demonstrate the trial court's actions in this case violated his constitutional rights.

Even assuming that the trial court's actions rose to the level of misconduct, petitioner has failed to show that the questioning rendered the trial fundamentally unfair as to violate due process.  A review of the case demonstrates that in the context of the trial as a whole, the trial court's actions did not render the trial fundamentally unfair.  See *Gayle v. Scully*, 779 F.2d 802, 807 (2d Cir. 1985) (trial judge's caustic, sarcastic comments and offensive conduct, although perhaps inconsistent with institutional

20

standards of federal courts, did not violate due process); *Daye v. Attorney General*, 712

F.2d 1566, 1571 (2d Cir. 1983) (trial judge's skeptical attitude toward defendant's

testimony, and his reinforcement of identification evidence by government witnesses,

"approached but did not cross the line that permits [a ruling] that the Constitution has

been violated").

      Finally, the trial court instructed the jury not to take anything that the trial court said

at trial as an indication of what it thought about the case or what the verdict should be.

Clerk's Transcript ("CT") at 641-42, 654-55.  The jurors are presumed to follow the court's

instructions.  *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000).  For all these reasons,

this claim is denied.

## II.    JURY INSTRUCTION

      Petitioner also contends that the trial court improperly instructed the jury with a

flight instruction, CALCRIM 372, which states: "if the defendant fled immediately after the

crime was committed, that conduct may show that he was aware of his guilt.  If you

conclude that the defendant fled, it is up to you to decide the meaning and importance of

that conduct.  However, evidence that the defendant fled cannot prove guilt by itself."  CT

at 693.  He argues that the evidence did not support the instruction and that it lightened

the prosecutor's burden of proof.

### BACKGROUND

      During a discussion with the trial court and the attorneys about jury instructions,

the prosecutor argued that the flight instruction should be given.  *Brown*, 2015 WL

7572482, at *11.  Petitioner's trial counsel objected, stating, "Brown just 'left' the scene

after Aisha got out of his car."  *Id.*  The trial court overruled the objection, stating:

> Well, there is a conflict in the evidence on that.  The conflict
> on the evidence is that she was screaming, she was calling,
> her face was against the window.  Finally, she was essentially
> able to escape, and then the defendant pulled off and then
> came back, and by his own testimony, he saw the guys, and
> he left.  [¶] So by that alone, I think it speaks to an inference
> under 372 that would be allowed.  Of course if [the jury
> doesn't] find that he fled, then this instruction is not going to
> apply. [¶]    The Court will certainly tell [the jury] that just

21

> because the instructions are given, it does not suggest what [the jury finds] the evidence to be.  Depending on what [the jury finds] the evidence to be, some instructions will apply and some not.

*Id.*

### LEGAL STANDARD

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings.  *See Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991).  Nor does the fact that a jury instruction was inadequate by Ninth Circuit direct appeal standards mean that a petitioner who relies on such an inadequacy will be entitled to habeas corpus relief from a state court conviction.  *See Duckett*, 67 F.3d at 744 (citing *Estelle*, 502 U.S. at 71-72).

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.  *See Estelle*, 502 U.S. at 72; *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous or even "universally condemned," but that it violated some [constitutional right].'").  The instruction may not be judged in artificial isolation but must be considered in the context of the instructions as a whole and the trial record.  *See Estelle*, 502 U.S. at 72.  In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process.  *United States v. Frady*, 456 U.S. 152, 169 (1982) (citing *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)); *see, e.g.*, *Middleton v. McNeil*, 541 U.S. 433, 434-35 (2004) (per curiam) (no reasonable likelihood that jury misled by single contrary instruction on imperfect self-defense defining "imminent peril" where three other instructions correctly stated the law).

A determination that there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution establishes only that an error has occurred.  *See Calderon v. Coleman*, 525 U.S. 141, 146 (1998).  If an error is found, the court also must determine that the error had a substantial and injurious effect or

22

influence in determining the jury's verdict, *see Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993), before granting relief in habeas proceedings.  *See Calderon*, 525 U.S. at 146-47.

### ANALYSIS

The California Court of Appeal denied this claim:

> A flight instruction is entirely appropriate when there is evidence of flight.  (§ 1127c; *People v. Mendoza* (2000) 24 Cal. 4th 130, 179 (*Mendoza*).)  "'[A] flight instruction is proper whenever evidence of the circumstances of defendant's departure from the crime scene or his usual environs, . . . logically permits an inference that his movement was motivated by guilty knowledge.'"  (*People v. Lucas* (1995) 12 Cal. 4th 415, 470.)   Contrary to Brown's argument, the evidence allows such an inference here.  Aisha Doe testified that when she was able to get out of Brown's truck, she ran to the two men who were standing near a disabled car.  Brown continued to drive for a short distance but started to back toward Aisha's location.  He then drove away.  Aisha and the two men walked to a nearby parking lot where, two or three minutes later, Brown drove by them.  The passenger window of the truck was down, suggesting Brown might have been trying to say something to Aisha.  Brown testified that, after Aisha got out of his car, he turned around and came back and saw her talking to the two men, and then "I just took off. I just left."
>
> This evidence allows an inference that Brown, after attempting to communicate with Aisha and seeing her with the two men, fled to avoid being observed or arrested.  (*See People v. Turner* (1990) 50 Cal. 3d 668, 695 [evidence of hasty departure supports inference of flight].)  The court's instruction appropriately permitted, without requiring, the jury to draw such an inference and, if it did so, to then give Brown's flight the weight it deemed appropriate.   The instruction did not direct the jury to draw a particular inference from the evidence and did not unconstitutionally lessen the prosecution's burden of proof.  (*Mendoza*, *supra*, 24 Cal. 4th at pp. 180-181.)  Indeed, the instruction emphasized that evidence of flight cannot prove guilt by itself.  (*See People v. Boyette* (2002) 29 Cal.4th 381, 438–439  ["'The cautionary nature of [a flight instruction and other challenged instructions] benefits the defense, admonishing the jury to circumspection regarding evidence that might otherwise be considered decisively inculpatory' "].)
>
> Finally, we note that, apart from the flight instruction itself, the court specifically instructed the jurors to disregard any instructions that did not apply in light of their factual basis.  The court instructed the jury with CALCRIM No. 200, which provides: "Some of these instructions may not apply, depending on your findings about the facts of the case. Do not assume just because I give a particular instruction that I am

1

> suggesting anything about the facts.  After you have decided what the facts are, follow the instructions that do apply to the facts as you find them."

2

3    *Brown*, 2015 WL 7572482, at *11-12.

4    Petitioner has failed to show that the state court opinion was an unreasonable

5    application of Supreme Court authority.  Moreover, the Ninth Circuit has found that a

6    similar type of flight instruction was proper.  *See Karis v. Calderon*, 283 F.3d 1117, 1132

7    (9th Cir. 2002).  In Karis, the Circuit found that the flight instruction did not violate due

8    process where the trial court gave the instruction regarding the evaluation of testimony

9    and evidence and instructed that flight alone was insufficient to establish guilt.  *Id.*

10   A review of the record indicates that the flight instruction was properly given and

11   was a reasonable inference from the facts of the case.  The victim testified that she was

12   able to escape petitioner's car and that he drove away, but then he drove back and left

13   after observing her talking to some people.  *Brown*, 2015 WL 7572482, at *1.  Petitioner

14   testified that after the victim got out of his car, he turned the car around, drove back, saw

15   her talking to people and left.  Reporter's Transcript at at 2027.  Similar to *Karis*, the trial

16   court instructed the jury regarding the evaluation of testimony and evidence and stated

17   that flight alone was insufficient to establish guilt.  Petitioner has failed to show that the

18   trial court erred in issuing the instruction.

19   Even assuming the issuance of  this instruction was erroneous, petitioner has not

20   shown that this one instruction had a substantial and injurious effect or influence in

21   determining the jury's verdict in light of all the evidence against petitioner.  The claim is

22   denied.

23   **III.    SENTENCING**

24   Petitioner argues that his sentence of 44 years and eight months plus a

25   consecutive indeterminate life sentence violates the Eighth Amendment.

26   **BACKGROUND**

27   The California Court of Appeal set forth the relevant background:

28   > As to the determinate sentence, the court imposed the upper

United States District Court
Northern District of California

term of eight years for count 1 (oral copulation as to Georgia Doe) (§ 288a, subd. (c)(2)(A)), and full, consecutive upper terms of eight years each for counts 2, 7, and 8 (respectively, sodomy as to Georgia Doe; sodomy as to Cynthia Doe; and oral copulation as to Cynthia Doe) (§§ 286, subds.(c)(2)(A), (k), 288a, subd. (k), 667.6, subds. (c), (d)).  As to count 6 (kidnapping A. Doe), the court imposed a consecutive term of five years (the middle term) (§§ 207, subd. (a), 208, subd. (a), 1170.1).  The court imposed a consecutive sentence of eight months (one-third the middle term) for count 3 (false imprisonment of Georgia Doe) (§ 237, subd. (a)).

As to count 5 (kidnapping of Aisha Doe to commit sodomy), the court imposed an indeterminate sentence of life imprisonment with the possibility of parole after a minimum of seven years. (§§ 209, subd. (b)(1), 3046, subd. (a).)  The court ordered that this sentence be served consecutively to (and after the completion of) the determinate sentence.

*Brown*, 2015 WL 7572482, at *13.

**LEGAL STANDARD**

A criminal sentence that is not proportionate to the crime for which the defendant was convicted violates the Eighth Amendment.  *Solem v. Helm*, 463 U.S. 277, 303 (1983).  Yet successful challenges to the proportionality of particular sentences are "exceedingly rare" outside "the context of capital punishment."  *Id.* at 289-90.  Eighth Amendment jurisprudence "gives legislatures broad discretion to fashion a sentence that fits within the scope of the proportionality principle—the precise contours of which are unclear."  *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003) (internal quotation marks and citations omitted).  "The Eighth Amendment does not require strict proportionality between crime and sentence.  Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime."  *Ewing v. California*, 538 U.S. 11, 23 (2003) (quoting *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991) (Kennedy, J., concurring)).  Where it cannot be said as a threshold matter that the crime committed and the sentence imposed are grossly disproportionate, it is not appropriate to engage in a comparative analysis of the sentence received by the defendant to those received by other defendants for other crimes.  *See United States v. Harris*, 154 F.3d 1082, 1084 (9th Cir. 1998).

United States District Court
Northern District of California

25

1    The Supreme Court upheld a life sentence without the possibility of parole for an

2    offender whose sole felony conviction was for possessing 672 grams of cocaine.

3    *Harmelin*, 501 U.S. at 961, 994.  In *Andrade*, the Supreme Court, under the highly

4    deferential AEDPA standard, upheld a sentence of two consecutive terms of 25 years to

5    life for the nonviolent theft of $150 worth of videotapes.  538 U.S. at 63, 77.

6    **ANALYSIS**

7    The California Court of Appeal set forth the relevant state and federal law and

8    denied this claim:

9    > On appeal, Brown does not contend that the court erred or
10   > abused its discretion in making any of the individual
     > sentencing determinations that resulted in the total sentence
11   > (such as selecting the upper term or imposing a consecutive
     > sentence for a particular count).  Nor does Brown expressly
12   > argue that his sentence is improper under any of the prongs of
     > the *In re Lynch* analysis.  Instead, he asserts generally that
13   > the sentence is cruel and unusual because he is in his late
     > forties and may not complete the imposed sentence in his
14   > lifetime.  We are not persuaded.

15   > The trial court explained in detail the reasons for its
     > sentencing decisions.  It explained that Brown's crimes
16   > included sexual assaults on Cynthia Doe and Georgia Doe
     > that involved "great violence and a high degree of cruelty" and
17   > caused the victims to suffer extreme physical trauma and
     > pain.  And it explained that Brown physically and mentally
18   > traumatized his victims by threatening them with arrest or
     > violence, handcuffing A. Doe to his vehicle, and sexually
19   > assaulting Cynthia Doe and Georgia Doe.  It further explained
     > that Brown's crimes involved planning and sophistication, and
20   > he intimidated the victims under false pretenses by using
     > badges and a walkie-talkie and pretending to be a police
21   > officer.  Finally, the court noted that Brown had expressed no
     > remorse for his conduct and had not acknowledged any
22   > wrongdoing.

23   > While we might not have reached the same determination as
     > the trial court on each of the sentencing decisions in this case
24   > had we been in the trial court's position, we cannot conclude
     > that the trial court abused its sentencing discretion or that the
25   > sentence imposed was shocking or inhumane.  (*See People
     > v. Andrade*, supra, 238 Cal.App.4th at p. 1310 [rejecting
26   > argument that sentence of 195 years to life was cruel and
     > unusual, where the defendant committed sexual assaults
27   > against five young women and intimidated them with threats
     > and statements that he was affiliated with law enforcement].)

28   *Brown*, 2015 WL 7572482, at *13.

United States District Court
Northern District of California

1    Petitioner has not shown that the state court opinion was objectively

2 unreasonable.  Petitioner was sentenced to 44 years and eight months plus a

3 consecutive indeterminate life sentence for the multiple sexual assaults and kidnapping.

4 If, as in *Harmelin*, a life sentence for a single, nonviolent, drug-possession conviction did

5 not violate the Eighth Amendment, and if, as in *Andrade*, a sentence of 50 years to life for

6 the nonviolent theft of videotapes also did not, then petitioner's sentence for his violent

7 crimes also does not violate the Eighth Amendment.  This claim is denied.

**APPEALABILITY**

8

9    The federal rules governing habeas cases brought by state prisoners require a

10 district court that denies a habeas petition to grant or deny a certificate of appealability

11 ("COA") in the ruling.  *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll.

12 § 2254 (effective December 1, 2009).

13    To obtain a COA, petitioner must make "a substantial showing of the denial of a

14 constitutional right." 28 U.S.C. § 2253(c)(2).  "Where a district court has rejected the

15 constitutional claims on the merits, the showing required to satisfy § 2253(c) is

16 straightforward:  The petitioner must demonstrate that reasonable jurists would find the

17 district court's assessment of the constitutional claims debatable or wrong."  *See Slack v.*

18 *McDaniel*, 529 U.S. 473, 484 (2000).  Section 2253(c)(3) requires a court granting a COA

19 to indicate which issues satisfy the COA standard.  Here, the court finds that the first

20 claim regarding judicial misconduct meets the above standard and accordingly GRANTS

21 the COA solely for that claim.  *See generally Miller-El*, 537 U.S. at 327.

22    Accordingly, the clerk shall forward the file, including a copy of this order, to the

23 Ninth Circuit Court of Appeals.  *See* Fed. R. App. P. 22(b); *United States v. Asrar*, 116

24 F.3d 1268, 1270 (9th Cir. 1997).

**CONCLUSION**

25

26    1.  The petition for writ of habeas corpus is **DENIED** on the merits.  A certificate of

27 appealability is **GRANTED**.  *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

28 Petitioner is cautioned that the court's ruling on the certificate of appealability does not

1   relieve him of the obligation to file a timely notice of appeal if he wishes to appeal.

2          2.  The clerk shall close the file.

3          **IT IS SO ORDERED.**

4   Dated: August 24, 2020

5

6                                                              _/s/ Phyllis J. Hamilton_

7                                                              PHYLLIS J. HAMILTON
                                                               United States District Judge